# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 10, 2013 Session

## ALEJANDRO GUANA v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Tipton County**
**No. 5561     Joseph H. Walker, Judge**

**No. W2012-01644-CCA-R3-PC  -  Filed December 26, 2013**

The Petitioner, Alejandro Guana,[1] appeals the Tipton County Circuit Court's denial of his petition for post-conviction relief challenging his conviction for first degree murder which resulted in a life sentence. On appeal, the Petitioner contends that the post-conviction court erred in denying relief alleging ineffective assistance of both trial and appellate counsel and trial court errors. Specifically, he submits that trial counsel was ineffective in the following ways: (1) failing to investigate and interview the State's witnesses, leaving him unprepared for cross-examination; (2) conceding that the Petitioner's actions were intentional, abandoning any viable defense; (3) failing to call an expert witness on his intoxication at the time of the shooting and failing to present a defense of diminished capacity; (4) failing to preserve his request for a mistrial and offer proof regarding a memorial service for the victim which took place during the sentencing phase of the Petitioner's trial; and (5) failing to ask for individual voir dire of any particular juror. As for appellate counsel, the Petitioner argues that he received ineffective assistance by counsel's failure to pursue the memorial service issue and the omission of a jury instruction on accomplice testimony on appeal. Finally, he alleges trial court error regarding the trial court's failure to give the instruction on accomplice testimony and the failure to declare a mistrial based upon the memorial service. Following our review, we affirm the denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Lyle A. Jones, Covington, Tennessee, for the appellant, Alejandro Guana.

---

[1] In the post-convictions petition, the Petitioner's last name is spelled as "Guana." It is also spelled the same way in the direct appeal opinion from this court. However, we note that, at times in these proceedings, his last name has been spelled as "Gauna."

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; Michael Dunavant, District Attorney General; and Jason Poyner, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

FACTUAL BACKGROUND

The Petitioner was convicted of first degree premeditated murder for killing Tennessee State Trooper Calvin Jenks during a routine traffic stop. He was sentenced to life in prison with the possibility of parole. He was also convicted of possession of marijuana with intent to deliver, for which he was to serve one year. See State v. Alejandro Chevo Guana, No. W2008-01304-CCA-R3-CD, 2010 WL 2593631 (Tenn. Crim. App. June 29, 2010, perm. app. denied, (Tenn. Nov. 18, 2010). This court affirmed on appeal, and the supreme court declined to review that decision. Id.

To assist in the resolution of this proceeding, we repeat here the summary of the facts set forth in the Petitioner's direct appeal:

> There is no dispute that [the Petitioner] shot and killed the victim, a trooper with the Tennessee Highway Patrol, during a routine traffic stop. Indeed, [the Petitioner] does not dispute most of the facts that were adduced at trial. In sum, those facts tell the following grim story.
>
> [The Petitioner] and his life-long friend, Orlando Garcia, purchased between 2.5 and 3.5 pounds of marijuana in their hometown, Austin, Texas, and drove to Tennessee to try to sell it. They were both minors at the time. They rented a silver Toyota Corolla, and [the Petitioner] acquired two guns—a .25 caliber and a .375 caliber—for the trip. They knew virtually no one in Tennessee, save Tyler Thomas, a friend of one of [the Petitioner's] ex-girlfriends. Ms. Thomas joined them in Millington, and the three drove to Memphis. There, they trolled the local malls looking to sell their marijuana. After having little success, they drove to Nashville where they got a room at a Best Western hotel and stashed most of the marijuana. Over the course of the next couple of days, they continued to try to sell marijuana. In addition to scouting the malls, they also drove through various neighborhoods looking for prospective buyers. They knew no one in Nashville.
>
> After a few days, [the Petitioner] and Mr. Garcia drove Ms. Thomas back to Millington. The three stopped at a rim shop, and Ms. Thomas called

someone to pick her up. While at the rim shop, [the Petitioner] met two men: Henry King and Shamus Pringle. Mr. Pringle said he might know someone who would be interested in buying some of [the Petitioner's] marijuana.

[The Petitioner] and Mr. Garcia left Millington to return to Nashville. Mr. Garcia was driving, and at that point they had only two or three ounces of marijuana with them, which was stashed in the middle console. Somewhere near Brownsville, the victim stopped them for speeding. The victim approached the driver's side of the car and asked Mr. Garcia for his license. When Mr. Garcia said he did not have his license with him, the victim asked him to get out and stand by the trunk of the car. The victim asked Mr. Garcia a few more questions and then asked whether there were any drugs in the car. Mr. Garcia initially said no, but after the victim pressed him, Mr. Garcia admitted that there were drugs in the middle console. The victim returned to the driver's door, took off his hat, placed it on top of the car, and leaned into the vehicle. [The Petitioner] had been sitting in the front passenger seat the entire time. As the victim leaned in, he asked [the Petitioner] where the "dope" was. [The Petitioner] then shot the victim twice in the head with the .25 caliber handgun. Mr. Garcia rushed to the front of the car, pulled the victim's body, threw it onto the highway, and drove away. The entire event was recorded by the video camera in the victim's patrol car.

After the shooting, [the Petitioner] and Mr. Garcia first drove to a gas station, looking for Armor All wipes to clean the car. The gas station did not sell them, so they stopped at Wal-Mart in Brownsville. They bought the wipes and cleaned out the car. They discarded the used wipes, the shells, the victim's flashlight, and a blood-stained towel in a trash can at Wal-Mart. They also decided to change clothes, so they bought new shirts and put them on. They then drove the rental car to a nearby apartment complex, where [the Petitioner] bent the license plate to make it difficult to see. The two men decided to abandon the rental car in the Brownsville apartment complex.

[The Petitioner] called Mr. Pringle and asked him for help. He said that he got Mr. Garcia into trouble and asked Mr. Pringle to drive the two back to Nashville. Mr. Pringle and his associate, Mr. King, agreed. When the four arrived at the Nashville hotel, [the Petitioner] gave Mr. Pringle approximately two pounds of the marijuana he had stashed there, and Messrs. Pringle and King left. Mr. Pringle testified that during the drive, [the Petitioner] was in the back seat "just [being] his self."

-3-

On the way back to Millington, Messrs. King and Pringle were picked up for a traffic violation. As they were being processed at the police station, it became clear that the two might have information related to the victim's death. Later that night, they guided the police back to the hotel room in Nashville, where the police apprehended [the Petitioner] and Mr. Garcia.

Id. at *1-2.

On November 4, 2011, the Petitioner filed a pro se petition for post-conviction relief. Thereafter, counsel was appointed, and an amended petition was filed, wherein the Petitioner alleged that he received the ineffective assistance of counsel at trial and on appeal and that the trial court committed various errors. As specific allegations regarding the ineffectiveness of trial counsel, the Petitioner cited the following grounds:

A. Trial [c]ounsel failed to properly investigate the State's witnesses, leaving him unprepared to properly conduct cross-examination.
B. Trial [c]ounsel failed to interview the State's witnesses, leaving him unprepared to properly conduct cross-examination.
C. Trial [c]ounsel effectively abandoned any attempt at a defense by conceding during cross-examination that the killing was intentional, denying the [Petitioner] a meaning adversarial test.
D. Trial [c]ounsel failed to present the testimony of Dr. Walker, whose report and testimony would mitigate the specific intent required for the crime of premeditated first degree murder.
E. Trial [c]ounsel failed to preserve his request for a mistrial regarding a memorial service being held at the Justice Complex by waiving the [c]ourt's ruling.
F. Trial [c]ounsel failed to complete an offer of proof, or take any testimony regarding the memorial service being held at the Justice Complex during the trial and sentencing of the [Petitioner].
G. Trial [c]ounsel failed to ask for individual voir dire of any particular juror, leaving him unable to assess the actual damage done by pre-trial publicity.

Regarding his claim of ineffective assistance of appellate counsel, the Petitioner alleged that appellate counsel was ineffective for "fail[ing] to pursue the [m]emorial [s]ervice issue on direct appeal and for fail[ing] to pursue the [c]ourt's failure to give the instruction on accomplice testimony." Finally, he alleged trial court error—first, the trial court's failure to deliver the jury instruction on accomplice testimony, and second, the trial court's failure to declare a mistrial due to the memorial service that took place at the courthouse.

-4-

An evidentiary hearing was held in the post-conviction court on July 20, 2012. Trial counsel was first to testify. According to trial counsel, the public defender's office was originally appointed to represent the Petitioner, and upon trial counsel's retention in the Petitioner's case, he began to review the public defender's file. Trial counsel stated that he also had an investigator appointed to assist with trial preparation, and that investigator interviewed the State's witnesses. Trial counsel recalled that he also interviewed some of the witnesses, although due to the passage of time, he could not provide specifics about such interviews. Trial counsel stated that, if the witnesses were interviewed by the investigators only, then he would have reviewed those reports. According to trial counsel, he had spoken personally with Tennessee Bureau of Investigation (TBI) "Agent Harmon"[2] "many times[,]" but again, due to the passage of time, he could not remember if he spoke with Agent Harmon specifically about the Petitioner's case. Trial counsel stated that he observed the co-defendant's trial, taking notes and obtaining transcripts, which prepared him for potential testimony against the Petitioner. Trial counsel also recalled speaking with the co-defendant's lawyer "a number of times about the case." According to trial counsel, he was "very familiar" with what the testimony of the State's witnesses would be.

When asked about the theory of defense, trial counsel provided the following explanation:

> The main defense, as I recall, was that we were hoping to avoid a first-degree murder conviction, that there was such overwhelming evidence of his involvement in the shooting, the fact that it was actually captured on video, that I felt that our best chance of prevailing in any way would have been to convince the jury that this was not premeditated, trying to create a defense that [the Petitioner] was a young kid who made some poor decisions, that he was scared and nervous, and that at the time that he fired the shots, he didn't do so in a premeditated fashion, but what he did was reacted to Trooper Jenks actually reaching into the car.

Trial counsel acknowledged that he did not "put any affirmative proof on" in the Petitioner's defense and that he attempted to establish this defense through cross-examination of the State's witnesses. When asked if he conceded to the jury that the shooting was "intentional," trial counsel responded,

> No, no, not that he had done it intentionally. . . . Well, not in a premeditated fashion. You know, I guess in a way we did concede that it was an intentional

---

[2] It is not clear from the record presently before this court this Agent's full identity or his relevance to this case.

act. It was sort of a long shot to say that he had acted in self-defense, but that was one of the avenues we kept open to an extent through our arguments.

Stated another way, "we tried to fashion a defense to avoid a first-degree murder conviction." Trial counsel agreed that this line of defense would have excluded some lesser-included offenses of first-degree murder with lesser mental states than an intentional act. When asked why he would want to do this, trial counsel strategized that "[t]he proof was just overwhelming that [the Petitioner] had pulled the trigger[,] and in order to gain some credibility" with the jury, it was best to "concede some points."

Trial counsel confirmed that he understood the defense of diminished capacity and that, "[i]n the context of this case[,] it would have to do with the inability for [the Petitioner] to form the requisite intent or premeditation to commit the crime he was charged with." In this vein, the public defender's office had already had the Petitioner evaluated by Dr. James Walker. Trial counsel stated that he received and reviewed Dr. Walker's report and that he spoke with Dr. Walker "on a number of occasions." Dr. Walker's report was admitted as an exhibit to the hearing.

Trial counsel referred to a section of the report which discussed the Petitioner's drug use at the time of the shooting, wherein Dr. Walker concluded, "[The Petitioner's] actions at the time of the event in question were affected by mental disorders at the time, including Cannabis/formal[d]ehyde intoxication and a depression/anxiety reaction related to stressors in his life and his chronic drug use." Trial counsel further relayed Dr. Walker's finding that he did "not believe [the Petitioner] was insane at the time" of the shooting but did "believe [that the Petitioner's] ability to make decisions at the time was impaired by his intoxication and mood anxiety reaction." Trial counsel "thought very, very hard about" his decision not to use Dr. Walker at trial.

Questioning then turned to the memorial service which took place outside the courthouse during the Petitioner's trial. The purpose of the service was to honor "fallen officers" and "was memorializing the victim in the case." Trial counsel made the following objection to the trial court based on these events, "We would make a motion for a mistrial based on some of the activities that have been going on today, and I think some of it may have even extended throughout the week." Trial counsel recalled that this memorial service occurred during the sentencing phase of the Petitioner's trial, and when a life sentence with the possibility of parole was imposed, the issue became moot according to trial counsel. He thereafter withdrew his motion for mistrial: "Judge, I know I made a mention earlier of a motion for a mistrial, which, of course, was based on things that took place today. Based on the decision that's been rendered by the [c]ourt I think that makes the motion moot."

-6-

Trial counsel opined that, even if he had not withdrawn the motion, it likely would have been denied because the events happened during sentencing and after the Petitioner had been convicted of the offense itself. When asked at the post-conviction hearing what trial counsel meant by his original statement to the trial court—"I think some of it may have even extended throughout the week"—he could not "recall what other events were going on throughout the week" but only that the memorial service took place. Trial counsel learned that this service was part of a nationwide week to honor "its fallen[.]" He remembered being "blind sided by the event." When asked how, if he desired to do so, he could have preserved this issue for the Petitioner, trial counsel replied that he would have raised it in the motion for new trial. It was also pointed out to trial counsel that the transcript reflected that he asked the court to hear testimony from Chief Turner,[3] who would have been able to testify about "what was going on around the courthouse at that time." Trial counsel did not recall ever calling Chief Turner, a bailiff, or any individual jurors to testify.

Trial counsel was then asked what steps, in addition to requesting individual and sequestered voir dire, he took "to seat an impartial jury[.]" Trial counsel said,

> I tried to ask as many questions as I could to find out who knew about this case and who didn't. I just remember having to be very careful based on the fact that it was not sequestered and individual voir dire. So I do remember feeling somewhat limited in that arena, but given the judge's ruling[,] I just tried to do my best to bring out any prior knowledge anybody would have had.

Specifically, trial counsel recalled that the Petitioner's confession had been broadcast on the local news. He did not question jurors about their knowledge of the confession, simply asking the venire generally if anyone had any knowledge of the case. Trial counsel recalled discussing these issues with potential jurors during voir dire. Trial counsel also moved for a change of venue, which request was denied.

A portion of the trial transcript was read into evidence, wherein trial counsel made a special request to the trial court for a jury instruction on accomplice testimony. Trial counsel noted that he would have made this request based upon the co-defendant's testimony against the Petitioner; however, trial counsel could not recall if this special instruction was included in the final jury charge. Then a portion of the trial transcript was read, wherein the trial court permitted the parties to correct or to amend the jury charge that was given, and counsel for both parties answered "no" when the opportunity was provided.

---

[3] This appears to be a reference to Tipton County Sheriff's Department Deputy Chief Donna Turner.

Trial counsel agreed that he did not raise the issues about the memorial service at the courthouse or the failure to give an accomplice instruction on direct appeal to this court.

On cross-examination, trial counsel testified that he had sufficient time to prepare for trial, meeting with the Petitioner regularly and reviewing discovery with him. According to trial counsel, he reviewed discovery with the Petitioner, and they discussed trial strategy, which, due to the overwhelming proof of guilt, "was to argue that this was something other than first-degree murder" and avoid a life sentence. Although he did not necessarily like it, the Petitioner was "on board with" this strategy according to trial counsel.

Trial counsel testified that he was present at the trial of the co-defendant, who was convicted of facilitation in this shooting. He also knew that the co-defendant had not been sentenced at the time of the Petitioner's trial and that there was not an agreement between the co-defendant and the State in exchange for the co-defendant's testimony.

When asked to explain his decision not to use Dr. Walker to establish a defense of diminished capacity, trial counsel said that, based upon his conversation with Dr. Walker, Dr. Walker would have testified that the Petitioner, despite being intoxicated, could still have formed the requisite intent for premeditated murder. Thus, trial counsel opined that Dr. Walker would not have been very helpful to the defense. Moreover, trial counsel noted that there were "also some negative things" in Dr. Walker's report that would have come out at trial if Dr. Walker had been called as a witness. He reiterated that "[i]t was a decision that [he] didn't take lightly."

Trial counsel did not know of any jurors who actually witnessed the memorial service and could not recall any other events taking place at the courthouse that week. Trial counsel confirmed that the memorial service "took place during [the jury's] deliberations on sentencing." When asked why he did not include this issue on appeal, trial counsel responded, "I think we had withdrawn our request. But again, I think it took place during a phase of the trial where they were making a decision, and that decision ultimately was to our benefit."

The Petitioner then called David Stockton, an attorney with the Public Defender's Office for the 25th Judicial District, who was qualified as an expert in criminal defense. Mr. Stockton testified that a criminal defense lawyer has a duty to investigate the circumstances and facts of a case, including investigating and interviewing potential State's witnesses. When asked if a failure to do so fell below an objective standard of reasonableness, Mr. Stockton replied that "to some extent, yes[, b]ut an attorney might focus toward other areas of the case, and there might not be a need to individually speak to a particular witness."

-8-

Regardless, a defense attorney "should be aware of what any witness is expected to say or testify about" according to Mr. Stockton.

Mr. Stockton testified that, if the defense makes the concession that the shooting was intentional in a first degree murder case, then that rules out the lesser-included offenses of reckless homicide and criminally negligent homicide. When asked if conceding intent in the Petitioner's case would fall below the standard of care, Mr. Stockton responded,

> It would depend on the focus of the trial. In this particular situation as far as the proof in the case there was a video of the event itself. There was little question about the perpetrator. The question comes down to intent of what was happening.
>
> The video did not itself display aggressive actions by the officer that would lead a normal person in a normal frame of mind to think, I'm under attack.
>
> . . . .
>
> So the idea of self-defense seems fairly limited, although in conjunction with being under the influence of an intoxicant, those two welded together, a person might say, [w]ell, a normal person wouldn't have been startled, but a person under the influence of drugs might misperceive how he is being approached by an officer. That would be one possibility.
>
> All we know really from the video for sure is that a weapon is fired. How it was being held or handled at the time might have led to the possibility of someone believing that in the handling of the gun perhaps the [Petitioner's] handling of the gun, barrel forward, there is no one able to testify except [the Petitioner] in that regard, and your choices then may be limited by his desire to take the stand or not take the stand. I don't know what the ultimate conclusion of the discussions were in that regard.
>
> But if you concede that the act was intentional, then you rule out an accident. There would be [a] lot of other factors in the case to determine whether or not it made sense or what a jury might do, but if you concede that the act was intentional, then you're going to rule out an accident and you're going to -- not necessarily self-defense, because I think if you act in self-defense that's a purposeful act. But with regard to the operation of the weapon, it would certainly rule out an accident.

Mr. Stockton further stated that, "[a]bsent other considerations," it would fall below the standard care to fail to introduce a report which said that the Petitioner's actions "were affected by mental disorders at the time including Cannabis, formaldehyde intoxication, and a depressive anxiety reaction related to the stressors in his life and his chronic drug use[.]"

Presumably in reference to the memorial service issue, Mr. Stockton testified that, in an effort to preserve the issue, a defense lawyer would "want to put on some proof in the record" at the motion for new trial hearing. A defense attorney would want to show what activities occurred and possibly impacted the jury, possibly through testimony from "Chief Turner or one of the sheriffs or . . . [t]he bailiffs[.]" Mr. Stockton said that, after the jury had rendered its sentencing decision, there would not be "any reason to avoid or to take steps to avoid tainting the jury[.]" He opined that there was "nothing to be gained" by waiving the motion for a mistrial, disagreeing that the issue was rendered moot by the jury's decision. According to Mr. Stockton, because the issue had been concluded when "the verdict came back life with parole[,] . . . [t]here wouldn't have been any reason not to go forward." Mr. Stockton further testified that the decision of whether to pursue the mistrial should have been discussed with the client in such a situation.

Mr. Stockton confirmed that the trial judge in this case allowed a defense attorney the opportunity to correct or amend the jury charge after the final charge had been given. If an instruction had been omitted, then that would be the time to bring it to the court's attention according to Mr. Stockton. Mr. Stockton said that the failure to so object would fall below the standard of reasonableness expected of defense lawyers because the issue would be considered waived on appeal.

On cross-examination, Mr. Stockton acknowledged that he was not aware of the contents of Dr. Walker's report, including any mention of negative or harmful details about the Petitioner. Mr. Stockton also agreed that he did not know whether it would have been "a good idea" for Dr. Walker to testify because he was "not familiar with the specific negatives" in this case. He explained, "There may be something that Walker may have told defense counsel that defense counsel could rely upon to say, [y]ou know, the risk is there. I think that's a decision that the attorney makes." If Dr. Walker had testified, the entire report "would have been fair game for the State" according to Mr. Stockton. Mr. Stockton opined that it could be a strategic decision not to call Dr. Walker as a witness "depending on what the circumstances were."

When asked if he had "conducted trials where perhaps the goal in the trial [was] not guilt or innocence but perhaps to mitigate sentencing[,]" Mr. Stockton replied, "Absolutely." The facts of this case were then reviewed with Mr. Stockton. Then, in response to the question, "what could a defense attorney have done differently to obtain a better result in this

case[,]" Mr. Stockton said, "I think the result in this case [was] about as good as it could possibly be." Mr. Stockton opined that the only outstanding question in this case was "whether or not the jury was tainted to some degree by activities that were beyond the control of the State[,]" which "perhaps" could have led to a retrial. However, "as far as witnesses, forensics, this case was just horrible from a defense standpoint" according to Mr. Stockton. Mr. Stockton agreed that there had been no actual proof or evidence presented at the post-conviction hearing "that the jury was tainted in any way[,]" positing that such proof was "lost[.]"

Mr. Stockton testified that if the jury had been polled or the bailiffs called to testify, then the issue would have been preserved. He further agreed that the trial court clerk would have a record of who those individuals were at the Petitioner's trial.

Trial counsel was recalled and testified that he did not remember consulting with the Petitioner before waiving ruling on the motion for mistrial. He clarified that, if any taint had been found at a hearing on motion for mistrial, he believed that a new jury would have been impaneled only for the sentencing portion of the Petitioner's trial because "any taint . . . had nothing to do with the underlying conviction itself." According to trial counsel, a better result than life with the possibility of parole could not have been obtained and, therefore, rasing the issue on appeal "would have been a waste of time."

The Petitioner was the final witness to testify. He testified that trial counsel did ask for the accomplice instruction, but upon the Petitioner's review of the jury charge, it did not appear that such an instruction was ever given. Regarding the importance of such an instruction, the Petitioner said, "They needed to know that, . . . in order to give the right amount of credibility to the [co-defendant's] statement [b]ecause that was their only support of premeditation."

The Petitioner stated that trial counsel did not consult with him on the decision to withdraw the motion for mistrial, although he did recall being told by trial counsel that the issue was "moot[.]" According to the Petitioner, the memorial service occurred "a little bit before the coming back of the conviction, of the actual conviction." As the Petitioner understood it, "the jury had to pass by the memorial in order to" enter the courtroom. The Petitioner thought trial counsel "was going to put on Donna Turner to basically testify to the fact that the jury was exposed to this memorial that was taking place the weekend of [his] trial, or the week of [his] trial."

The Petitioner confirmed that trial counsel advised him not to testify at trial, and upon that advice, he did not do so. Regarding the decision not to call Dr. Walker as a witness, the Petitioner said trial counsel also did not consult with him on this decision, and he "really

didn't understand what [trial counsel] was saying as far as not, why [the Petitioner] shouldn't put [Dr. Walker] on." The Petitioner continued, "[W]hat I remember [trial counsel] telling me was the fact that he wasn't putting [Dr. Walker] on was because he didn't want the jury to be exposed to [the Petitioner's] drugs, that [he] was selling drugs in Austin before coming up here." The Petitioner stated that he "really wasn't in agreement with that" defense strategy. However, he deferred to the advice from his attorney, and the defense did not call any witnesses "to show that at the time of the crime intoxication was a factor[.]" The Petitioner noted that trial counsel's defense strategy was to "fight for second-degree murder," "fight[ing] the fact that it was premeditated." The Petitioner opined that, instead, "the best strategy would have been the diminished capacity" using Dr. Walker's diagnosis, which "would have went well with the fact that [he] was a minor at the time of the event[.]"

On cross-examination, the Petitioner said that to support a defense of diminished capacity trial counsel should have called Dr. Walker or the Petitioner to testify at trial. The Petitioner said he would have told the jury "[t]hat it was not premeditated, . . . that [h]e was depressed at the time and [he] had mental issues at the time and the fact that [he] was intoxicated at the time, . . . with all them circumstances it would have been, . . . a mitigating factor to the jury to see that this was not a first-degree murder charge." The Petitioner opined "that all the evidence that was admitted at trial was not true."

When asked about the availability of other witnesses for his trial, the Petitioner said that "[n]o one was really able, willing to go out of their way to come and testify, even if they did have viable information." The Petitioner stated that trial counsel "kind of talked [him] down from a lot of witnesses" he wanted to testify at trial. The Petitioner further testified that post-conviction counsel said "he was having trouble finding a lot of the witnesses and that it would have been hard." The Petitioner wanted to call jury members to testify at the post-conviction hearing, but "[they] didn't have the names of the jurors and stuff like that[.]"

By order filed on July 23, 2012, the post-conviction court denied the Petitioner relief. In addressing the Petitioner's allegations, the post-conviction court ruled as follows:

> Failing to investigate: Petitioner alleges that counsel failed to investigate. There was investigation done by the public defender and their investigator. [Trial counsel] reviewed the file of the public defender and discussed the case with them when he took over the case. [Trial counsel] employed an investigator who worked the case. [Trial counsel] reviewed all statements and the investigator's report. [Trial counsel] interviewed witnesses. The murder occurred on video.

The [P]etitioner testified that he did not know of any other witnesses that trial counsel should have called, other than Dr. Walker or himself. Petitioner was given a chance at trial to testify and chose not to testify. After hearing his testimony at the hearing, the court considers that he made a wise choice at trial by not testifying.

The [P]etitioner has failed to show [trial counsel] was deficient with regard to investigation or that deficient performance was prejudicial.

Failing to call Dr. Walker: Petitioner alleges that counsel was deficient by not calling Dr. Walker as a witness. [Trial counsel] reviewed the report and spoke extensively to Dr. Walker. He believed that his testimony would do more harm than benefit. He discussed this with the [P]etitioner. The [P]etitioner also testified that [trial counsel] had discussed this with him. The [S]tate had a strong case with regard to the [Petitioner's] committing the crime. To show that the [P]etitioner was under the influence of drugs would not necessarily negate the intentional nature of the act. It was a decision to be made by counsel in conjunction with [P]etitioner, which is what was done. The [P]etitioner has failed to show [trial counsel] was deficient in that regard or that the deficient performance was prejudicial.

Jury charge: Petitioner states he wanted to appeal the jury charge as a whole, however he failed to show an error in the charge. Counsel was not deficient in failing to have the charge typed, since there was no issue in the motion for new trial, and the charge should not have been included absent an issue in that regard.

Petitioner testified as to his belief of what the charge about an accomplice testifying should have been, but was in error about Tennessee law. Petitioner has failed to show an error with regard to the jury charge.

The [P]etitioner has failed to show [trial counsel] was deficient with regard to the jury charge or that deficient performance was prejudicial.

The [P]etitioner's attorney requested the jury charge to be prepared before ruling on the petition for post[-]conviction relief. The petition was filed in November 2011. The hearing has been reset once, without request for the charge to be prepared. The request for the jury charge to be typed before ruling on the petition is denied.

Memorial Service: There was a memorial service during the sentencing phase of the trial, and [trial counsel] made a motion with regard to that as will be shown in the record. Counsel felt that after the jury returned a verdict of life with the possibility of parole there was nothing to be gained in assigning this as error. Petitioner has failed to show that the service had any effect on the trial or sentencing. The [P]etitioner has failed to show [trial counsel] was deficient in that regard or that the deficient performance was prejudicial.

This timely appeal followed.

## ANALYSIS

On appeal, the Petitioner raises issues of ineffective assistance of counsel and argues that the trial court made several errors during his trial. Specifically, he submits that trial counsel was ineffective in the following ways: (1) failing to investigate and interview the State's witnesses, leaving him unprepared for cross-examination; (2) conceding that the Petitioner's actions were intentional, abandoning any viable defense; (3) failing to call an expert witness on his intoxication at the time of the shooting and presenting a defense of diminished capacity; (4) failing to preserve his request for a mistrial and offer proof regarding a memorial service for the victim which took place during the sentencing phase of the Petitioner's trial; and (5) failing to ask for individual voir dire of any particular juror. As for appellate counsel, the Petitioner argues that he received ineffective assistance by counsel's failure to pursue the memorial service issue and the omission of a jury instruction on accomplice testimony on appeal. Finally, he alleges trial court error regarding the trial court's failure to give the instruction on accomplice testimony and the failure to declare a mistrial based upon the memorial service.

Petitions for post-conviction relief are governed by the Post-Conviction Procedure Act. Tenn. Code Ann. §§ 40-30-101 to -122. To obtain relief, the petitioner must show that his conviction or sentence is void or voidable because of the abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The petitioner must prove his factual allegations supporting the grounds for relief contained in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(2)(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is clear and convincing when there is no substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

The post-conviction court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. See State v. Nichols, 90 S.W.3d 576, 586 (Tenn. 2002) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)); see also Fields v.

State, 40 S.W.3d 450, 456-57 (Tenn. 2001). The petitioner has the burden of establishing that the evidence preponderates against the post-conviction court's findings. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). This court may not re-weigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. Nichols, 90 S.W.3d at 586. Furthermore, the credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the post-conviction court. Bates v. State, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).

## I. Ineffective Assistance of Counsel

On appeal to this court, the Petitioner argues that his counsel, both at trial and on appeal, failed to provide the effective assistance guaranteed him by the United States and Tennessee constitutions. Initially, we note that, on appeal, several of the Petitioner's issues are presented slightly differently than they were addressed by the post-conviction court.

Ineffective assistance of counsel claims are regarded as mixed questions of law and fact. State v. Honeycutt, 54 S.W.3d 762, 766-67 (Tenn. 2001). Thus, the post-conviction's findings of fact underlying a claim of ineffective assistance of counsel are reviewed under a de novo standard, accompanied with a presumption that the findings are correct unless the preponderance of the evidence is otherwise. Fields, 40 S.W.3d at 458 (citing Tenn. R. App. P. 13(d)). The post-conviction court's conclusions of law are reviewed under a de novo standard with no presumption of correctness. Id.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland, 466 U.S. at 687; see Lockart v. Fretwell, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance was deficient is not enough; rather, the petitioner must also show that but for counsel's deficient performance, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Strickland standard has also been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. See Henley, 960 S.W.2d at 580. The performance prong requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness or was "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been

-15-

different." Id. at 694. "A reasonable probability means a probability sufficient to undermine confidence in the outcome." Id. Failure to satisfy either prong results in the denial of relief. Id. at 697.

Both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation includes the right to "reasonably effective" assistance, that is, within the range of competence demanded of attorneys in criminal cases. Strickland, 466 U.S. at 687 (1984); Burns, 6 S.W.3d at 461; Baxter, 523 S.W.2d at 936. In reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

*A. Investigation and Preparation, Including Interviewing Witnesses*

First, the Petitioner contends that trial counsel failed to "properly investigate the State's witnesses, and thereby being unprepared to properly conduct cross-examination." Specifically, he alleges that "trial counsel did not interview Ms. Tyler Thomas, Mr. Glen Mabry, Issac, Evans, Henry King, or Shamus Pringle, all witnesses called by the [S]tate" and that "[t]rial counsel also could not recall talking to TBI Agent Harmon, another [S]tate's witness[,]" which left trial counsel unprepared for cross-examination. The Petitioner's claim is really one of inadequate investigation and preparation for trial. The State responds that the Petitioner has failed to prove his factual allegations by clear and convincing evidence and that the Petitioner has failed "to provide any examples of what questions should or should not have been asked and/or what 'proof' would have been discovered by further investigation."

The record supports the findings of the post-conviction court in this regard. Trial counsel testified that he reviewed the public defender's file upon being retained. He also hired an investigator to assist in preparation of the Petitioner's defense, including interviewing witnesses. Trial counsel stated that he had sufficient time to prepare for trial, meeting with the Petitioner regularly and reviewing discovery with him. Trial counsel testified that, if he did not interview the witnesses personally, then he would have reviewed the report prepared by the investigator. Contrary to the Petitioner's allegation in his brief, trial counsel testified that he did speak with Agent Harmon "many times[,]" although he could not recall the specifics of those conversations or whether they discussed the

Petitioner's case, due to the passage of time. Moreover, trial counsel stated that he was present for the co-defendant's trial, took notes, and obtained transcripts from those proceedings. He also was in frequent contact with the co-defendant's lawyer in this case.

Trial counsel believed that he was "very familiar" with what the testimony of the State's witnesses would be. The State correctly points out that the Petitioner has offered no proof to counter trial counsel's testimony. Moreover, Mr. Stockton, the Petitioner's own expert, stated that a defense attorney has a duty to investigate and interview potential witnesses, which does not necessarily require that a defense attorney talk to every witness but simply have knowledge of what each witness will say. As aptly alleged by the State, the Petitioner does not provide this court with any evidence of what further investigation on the part of trial counsel would have revealed or how it would have led to more effective cross-examination of the State's witnesses. The Petitioner has failed to establish that trial counsel's failure to investigate and interview witnesses was deficient performance or resulted in prejudice to him.

*B. Diminished Capacity Defense and Calling Dr. Walker to Testify*

Next, the Petitioner contends that the trial counsel denied him "a meaningful adversarial test by conceding that the killing was intentional." The Petitioner points to Mr. Stockton's testimony that, by conceding intent, trial counsel "ruled out any form of accident" and, thus, excluded from the jury's consideration the lesser-included offenses of reckless homicide and criminally negligent homicide. The State responds that, based on the overwhelming evidence of the Petitioner's guilt, trial counsel made "an informed and strategic decision to try and gain some credibility with the jury by admitting the intentional nature of the act while arguing that the [P]etitioner acted out of fear and not premeditation."

The Petitioner also argues that trial counsel failed "to present the testimony of Dr. Walker, whose report would mitigate the specific intent required for the crime of premeditated first degree murder." The Petitioner notes that trial counsel had Dr. Walker's report and that calling Dr. Walker as a witness would have helped him to establish a diminished capacity defense. Without Dr. Walker, no "mitigating evidence" to "negate the specific intent required in a case of premeditated murder" was presented to the jury according to the Petitioner. The State notes that the Petitioner failed to call Dr. Walker at the post-conviction hearing and that the Petitioner therefore has failed to meet his burden.

The Petitioner's argument is really that trial counsel should have presented a defense of diminished capacity, rather than simply challenging the evidence of premeditation, and he called Dr. Walker in support of that diminished capacity defense. Again, the record supports

the post-conviction court's findings that the Petitioner received the effective assistance of counsel in this regard.

Trial counsel stated that the "main defense" was to avoid a first degree murder conviction by challenging the evidence of premeditation, i.e.,

> trying to create a defense that [the Petitioner] was a young kid who made some poor decisions, that he was scared and nervous, and that at the time that he fired the shots, he didn't do so in a premeditated fashion, but what he did was reacted to Trooper Jenks actually reaching into the car.

Trial counsel acknowledged that he did not "put any affirmative proof on[,]" attempting to establish the defense through cross-examination of the State's witnesses. He agreed, by conceding the intentional nature of the act, some lesser-included offenses would have been excluded from consideration but stated that such was necessary given the "overwhelming evidence" of guilt. Trial counsel also testified that he discussed trial strategy with the Petitioner, which "was to argue that this was something other than first-degree murder" and avoid a life sentence. Although the Petitioner did not necessarily like this strategy according to trial counsel, he was nonetheless "on board with it[.]"

Trial counsel confirmed that he understood the defense of diminished capacity. He also had received and reviewed Dr. Walker's report and spoke with Dr. Walker "on a number of occasions." Trial counsel testified that, based upon his conversations with Dr. Walker, he believed that Dr. Walker would have testified that the Petitioner, despite being intoxicated, could still have formed the requisite intent for premeditated murder, and thus, he did not consider Dr. Walker to be a very helpful witness to the defense. Moreover, trial counsel also thought there were some "negative things" in Dr. Walker's report that would have been admissible at trial had Dr. Walker been called to testify.

As noted by the post-conviction court, the Petitioner testified that he did not know of any other witnesses that trial counsel should have called in support of a diminished capacity defense, other than Dr. Walker or himself, and following the advice of counsel, the Petitioner chose not to testify at trial. The post-conviction court found trial counsel's testimony credible that the defense strategy was made "in conjunction" with the Petitioner. After hearing and observing the Petitioner testify at the post-conviction hearing, the post-conviction court also found it "a wise choice" for the Petitioner not to have testified at trial.

Additionally, as noted by the State, the Petitioner did not present Dr. Walker at the hearing. This court has long held that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should

-18-

be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). This is the only way the petitioner can establish that failure "to call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." Id. Live testimony from the witness is usually necessary for the post-conviction court to evaluate whether the testimony is admissible, material, and credible. Pylant v. State, 263 S.W.3d 854, 869-70 (Tenn. 2008). We cannot speculate as to what a witness may have said if presented or how the witness may have responded to a rigorous cross-examination. Black, 794 S.W.2d at 757.

Moreover, the Petitioner's own expert could not testify whether it would have been "a good idea" for Dr. Walker to testify because he was "not familiar with the specific negatives" in this case. Mr. Stockton explained, "There may be something that Walker may have told defense counsel that defense counsel could rely upon to say, [y]ou know, the risk is there. I think that's a decision that the attorney makes." Mr. Stockton further opined that it could be a strategic decision not to call Dr. Walker as a witness "depending on what the circumstances were." Finally, Mr. Stockton noted that it was a viable trial strategy "where perhaps the goal in the trial [was] not guilt or innocence but perhaps to mitigate sentencing" and that he had pursued just such a defense. After reviewing the facts of this case, Mr. Stockton said, "I think the result in this case [was] about as good as it could possibly be." We agree with the post-conviction court that the Petitioner has failed to show trial counsel was deficient in this regard or that any deficient performance was prejudicial.

*C. Memorial Service*

The Petitioner submits that trial counsel was ineffective for failing "to preserve his request for a mistrial regarding a memorial service being held at the Tipton County Justice Complex by waiving the court's ruling." The Petitioner again notes Mr. Stockton's testimony that the "proper procedures to follow" would have been "to put proof on the record" by calling witnesses and that "there would be no good reason not to take proof from the jury itself." The Petitioner further details that trial counsel did not consult with him before withdrawing the request for a mistrial and that, by waiving the issue, he was prevented from raising the issue on appeal. The Petitioner also argues that appellate counsel provided ineffective assistance by "not raising the issue of the memorial service on direct appeal[,]" denying him appellate review of the issue. The State responds that the Petitioner has failed to meet his burden because "any pursuit of this claim would have been fruitless due to the fact that the jury returned the less restrictive sentence possible."

The State submits that "it is undisputed that such service did take place outside of the courthouse while the jury was deliberating during the penalty phase." This is a bit of an overstatement, given that the Petitioner testified that the memorial service occurred "a little

bit before the coming back of the conviction, of the actual conviction[,]" and that trial counsel's objection was somewhat ambiguous ("I think some of it may have even extended throughout the week."). However, trial counsel clarified that, based upon his recollection, the memorial service took place during the sentencing phase of the Petitioner's trial. He also could not "recall what other events were going on throughout the week." Also, when trial counsel moved to withdraw the motion for mistrial, he stated to the trial court that the motion "was based on things that took place today." The Petitioner has offered nothing to counter this conclusion other than his own self-serving testimony that the memorial service took place before his conviction was returned. Here, the post-conviction court concluded that the memorial service occurred during the sentencing phase of the Petitioner's trial, and the record does not preponderate against that finding.

Trial counsel testified that, once a sentence of life with the possibility of parole was imposed,[4] the issue was rendered moot, as this was the most favorable result. He could not recall if he discussed the decision to waive a ruling on the motion for mistrial with the Petitioner, although the Petitioner had recollection of being told by trial counsel that the issue was "moot." The Petitioner's expert testified that a defense attorney would want to put on proof of what activities occurred that possibly impacted the jury. According to Mr. Stockton, there would be "nothing to be gained" by waiving the motion for mistrial and not putting on any proof.

We agree with Mr. Stockton's testimony that the Petitioner did not put on any actual proof at the post-conviction hearing "that the jury was tainted in any way[,]" although we disagree that such proof was "lost[.]" We have no reason to believe, and have not been presented with any proof, that the trial court clerk would not have a record of who the bailiffs and jurors were in the Petitioner's case. The Petitioner's allegation that finding these witnesses was proving to be "hard" does not negate his burden. Again, other than his own self-serving testimony, the Petitioner has failed to present any proof that a single juror witnessed, or was influenced by, the memorial service taking place outside the courthouse. In fact, trial counsel testified that he had no actual knowledge of such. As such, even if trial counsel's performance was deficient, the Petitioner cannot show that he was prejudiced by trial counsel's failure to pursue a mistrial based upon the memorial service. See Black, 794 S.W.2d at 757.

Trial counsel testified that he did not pursue the issue on appeal, concluding that it "would have been a waste of time." He testified, that if any taint had been found, he believed

---

[4] In the direct appeal opinion, this court noted that the jury deadlocked on whether to enhance the Petitioner's sentence to life without the possibility of parole. As a result, the trial court imposed a sentence of life with the possibility of parole. See Guana, 2010 WL 2593631, at *6.

that a new jury would have been impaneled for the sentencing portion only of the Petitioner's trial because "any taint . . . had not thing do with the underlying conviction itself." We agree with trial counsel that, when reversible error occurs during the sentencing phase of a criminal proceeding, reversing the judgment as to the sentence only is generally appropriate. See, e.g., State v. Riels, 216 S.W.3d 737 (Tenn. 2007); State v. Odom, 928 S.W.2d 18 (Tenn. 1996).

The principles for determining the effectiveness of counsel at trial and on appeal are the same in a post-conviction proceeding. See Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995). A petitioner alleging ineffective assistance of appellate counsel must prove both that 1) appellate counsel was objectively unreasonable in failing to raise a particular issue on appeal, and 2) absent counsel's deficient performance, there was a reasonable probability that the petitioner's appeal would have been successful before the state's highest court. See Smith v. Robbins, 528 U.S. 259, 285 (2000). Because there has been no proof that the jury was actually tainted during the conviction process, and because a more favorable result could not have been obtained during the sentencing phase, the Petitioner's allegation regarding ineffective assistance of appellate counsel in this regard must fail.

### D. Voir dire

The Petitioner asserts that trial counsel failed "to request individual voir dire of any particular juror, leaving him unable to assess the actual damage done by pretrial publicity." The Petitioner submits, trial counsel's "[a]sking only general questions did not get to the heart of the matter—the ultimate issue of whether the jury veniremen were aware of the [Petitioner's] confession at the transfer hearing that had been reported by the only local newspaper." The State responds that "it is abundantly clear from the record that [trial counsel] requested individual voir dire before trial and during voir dire" and that each of trial counsel's requests were denied.

We agree with the State that the record is clear that trial counsel requested individual voir dire in the Petitioner's case and that his multiple requests were denied. See Guana, 2010 WL 2593631, at *3. Trial counsel testified that, after his initial request was denied, he "tried to ask as many questions as [he] could to find out who knew about this case and who didn't." He did not delve into the specifics of the Petitioner's confession, asking the venire generally if they had knowledge of the Petitioner's case. The record reflects that trial counsel was able to illicit this information from the potential jurors. See id. at *4. He renewed his motion for individual and sequestered voir dire upon learning that many of the jurors were aware of the case. See id. That request was again denied, and thereafter, trial counsel never requested any particular juror be questioned individually. See id. The issue was raised on appeal, and this court found that the trial court did not abuse its discretion in denying trial counsel's requests. See id. at *12-13 ("We thus conclude that this situation does not present the type of

'significant possibility that a juror has been exposed to potentially prejudicial material' that mandates individual, sequestered voir dire.") (quoting State v. Hugueley, 185 S.W.3d 356, 390 (Tenn. 2006)).  The record belies the Petitioner's allegations of deficient performance and prejudice in this regard.

*E. Accomplice Instruction*

The Petitioner argues that appellate counsel provided ineffective assistance by failing "to pursue the [t]rial [c]ourt's failure to give the jury instruction on accomplice testimony[.]" In so arguing, he faults trial counsel for not objecting to the omission of the instruction when given such an opportunity by the trial court to correct or amend the charge, noting that Mr. Stockton testified that this would have been the appropriate time to do so in order to preserve a proper objection.  Regardless, he submits that trial counsel should have raised the omission of the instruction at the motion for new trial hearing or appellate counsel should have presented the issue on appeal.

In a related issue, the Petitioner submits that the post-conviction court erred "by failing to delay ruling on the petition until after the jury charge had been prepared[,]" and thereby denying him due process.  The Petitioner notes that "[a]bsent a transcription of the jury charge, there is no way to put on proof that the trial court failed to deliver a full and complete charge of the law," especially as it relates to the accomplice instruction.  The State notes the late-timing of the Petitioner's request in the post-conviction court and asks us to hold the failure to include the jury instructions in the appellate record against the Petitioner. We decline to do so.  The indigent Petitioner requested the instructions be transcribed by the post-conviction court; we will require no more of him.  The post-conviction court should have granted that request, as that was the easiest way to address this claim, allowing for a determination of whether the accomplice instruction was actually given following trial counsel's request for such.

Nonetheless, we agree with the State that were we to assume that the accomplice instruction was not given in the final charge to the jury, the Petitioner still cannot demonstrate ineffective assistance of counsel for failing to raise the issue at the motion for new trial or on appeal.  This court has held that a trial court's failure to give an accomplice instruction was harmless when there was sufficient corroboration of the accomplice's testimony.  State v. Ballinger, 93 S.W.3d 881, 888 (Tenn. Crim. App. 2001).  On direct appeal in this case, this court determined that "[t]here was more than adequate evidence to corroborate Mr. Garcia's testimony against [the Petitioner]." Guana, 2010 WL 2593631, at *14.  "The evidence against [the Petitioner] from a variety of sources—including fact witnesses, expert witnesses, and the physical evidence—corroborated Mr. Garcia's testimony and also independently pointed to [the Petitioner's] guilt." Id.  This issue is without merit.

*II. Trial Court Errors*

As a separate ground for relief, the Petitioner cites to two errors of the trial court. First, he contends that the trial court's failure to give the jury instruction on accomplice testimony violated his constitutional right to a jury trial. In so alleging, the Petitioner notes that "it was the testimony of the co-defendant that was relied upon by the [S]tate to prove the element of premeditation." As a second error of the trial court, the Petitioner alleges that, "even in the face of trial counsel's waiver," the trial court "failed to declare a mistrial due to the service being conducted at the courthouse in memory of Calvin Jenks, the victim in this case[,]" thereby infringing upon his rights to due process and a fair and impartial jury.

The Petitioner is couching these trial court errors in terms of violation of constitutional error. The procedures available to correct constitutional errors in the conviction process do not stop with direct appeal but can also be included in a timely filed post-conviction petition. See Tenn. Code Ann. § 40-30-103.

Concerning the Petitioner's claim that he is entitled to post-conviction relief because the trial court failed to issue an instruction on accomplice testimony, "[i]t is well-settled that a defendant has a constitutional right to a complete and correct charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Dorantes, 331 S.W.3d 370, 390 (Tenn. 2011). Additionally, regarding the possibility of a tainted jury, it is not disputed that the fundamental right to be tried by a fair and impartial jury continues through the sentencing phase of trial. See U.S. Const. amend. VI; Tenn. Const. art. I, § 9; see also State v. Harbison, 704 S.W.2d 314, 318-319 (Tenn. 1986) (rejecting the argument that a defendant is entitled to separate juries during the guilt and sentencing phases of a capital trial in order to guarantee a fair trial by a jury that represented a cross section of the community); State v. Shepherd, 862 S.W.2d 557, 570 (Tenn. Crim. App. 1992) ("[O]ur constitutional system of justice demands that the determination of guilt and imposition of sentence arise from a fundamentally fair hearing which includes the right to a fair and impartial jury." (Emphasis added)).

However, this court has held that neither the plain error doctrine, the rule which permits constitutional issues to be raised at any stage of the proceedings, nor the rules of procedure "mandate that a petitioner has an absolute right to litigate a ground in a post-conviction proceeding when the record clearly reflects that the ground has been waived." See Gary Wayne Thurbush v. State, C.C.A. No. 89-173-III, 1990 WL 103633, at *3 (Tenn. Crim. App. July 26, 1990); see also Daniel Ewing v. State, No. M2010-02282-CCA-R3-PC, 2011 WL 4449673, *7 (Tenn. Crim. App. Sept. 27, 2011) ("[A]ppellate review is generally limited to the issues raised and decided in the trial court[,]" and "[t]he plain error doctrine has no application in post[-]conviction relief proceedings."). In a petition for

post-conviction relief, a ground for relief is generally deemed waived if the petitioner had an opportunity to raise the issue previously but failed to do so. See Tenn. Code Ann. § 40-30-106(g). The Petitioner's issues were waived by trial counsel when the issue of the omitted jury instruction was not raised at the motion for new trial, when trial counsel withdrew the motion for a mistrial and never presented it to the trial court for ruling, and when appellate counsel failed to present the issues on direct appeal.

Moreover, as noted above, the omission of this instruction is subject to harmless error, and the Petitioner cannot show that he is entitled to relief because there was sufficient corroboration of the accomplice's testimony. Regarding the argument that the Petitioner's rights to due process and a fair and impartial jury were denied when the trial court failed to sua sponte declare a mistrial based upon the memorial service that took place at the courthouse, we reiterate that the Petitioner has not provided this court with any proof that his jury was tainted or, if so, what remedy would be available to him when he received the least possible sentence. He is not entitled to relief on the basis of trial court error.

CONCLUSION

The Petitioner has failed to prove by his allegations by clear and convincing evidence. We, therefore, affirm the judgment of the post-conviction court denying relief.


_____
D. KELLY THOMAS, JR., JUDGE